Good morning. Welcome to the Ninth Circuit. Before we start with the argument calendar, there are several cases we have submitted. Soto v. Bondi is one case we have submitted. We have two cases on the argument calendar. The first is Moreland Properties v. Goodyear and counsel, whenever you are ready. Good morning. May it please the Court that I am Dominic Dre and with Stuart Kimball, I represent the appellant, Moreland Properties. I will try to reserve four minutes for rebuttal. There is no doubt that Goodyear misled state regulators, its neighbors and the eventual buyer of its arsenic-soaked property. The only question is whether it can dodge responsibility through two sleights of hand. One, misreading the statute of limitations for fraud and two, leveraging immaterial departures from the National Contingency Plan to avoid reimbursement under CERCLA. The first of these is a straightforward issue because the Supreme Court of the United States has already interpreted identical language in the Securities Exchange Act. That's the Merck decision. The quote-unquote facts constituting fraud includes Scienter because without Scienter, Moreland doesn't have a cause of action for fraud. The first point at which a reasonable person would have known or could have discovered with exercise of diligence, excuse me, the existence of Scienter was the 2020 Synergy Report that explained that Goodyear just didn't do the step-out sampling it was required to. But that was triggered by Moreland getting that report, which it could have gotten five years earlier. Well, it's not an inquiry standard, Your Honor. I thought it is an inquiry standard. Ah, no, Judge. That's a good clarification. Well, I understand that you said that the statute says otherwise, but I thought it was interpreted as an inquiry standard. No, ma'am. So I'll call the Court's attention to the Gus Rosenfeld case in which the Arizona Supreme Court said this. Discovery means, quote, plaintiff knows or in the exercise of reasonable diligence should know the facts, end quote. And the facts constituting fraud, the Arizona Court of Appeals, we cite the Leninger case for Scienter as a required element. I don't understand. Why isn't it should have known an inquiry standard? So should have known is different from would have investigated. In fact, see page 651 of the Supreme Court's decision in Merck, in which it expressly says that this language is not an inquiry standard. Well, whatever it is, it doesn't require that they knew it. It requires that they should have known it, meaning they should have found it out. So I don't understand the difference between that and inquiry standards. It's a verbal difference as far as I can tell. No, Judge, I actually want to spend a moment on that because the Supreme Court explains, for example. What page are you on? 651 of Merck. The Court says if by inquiry you mean the moment at which a person would have investigated, that is not the same as when you should know or with diligence would have known. Well, but that's a different question. I mean, that's whether they whether we're looking from, you know, one date in 2015 or a later date in 2015. I mean, it's what they would have. In other words, that seems to me to be saying you don't look at the day that they found out enough to have that they should have known, but when they eventually found it out. But still, when they went to find out, it took a couple of months. So why couldn't they have done that five years earlier? So, Judge, bear in mind that there are two parts to your Honor's question. The first is what the what the report says in 2015. We're talking about the WTI report. WTI 2015. And this is the sole basis on which the district court granted summary judgment. Summary judgment, by the way, when every fact is taken in our favor. At that point, the report says, quote, it's possible that the quote estimates upon which the doer has been established may be underestimated. But that's but that's not all that it says. If you look at page nine of the report, SCR 296, they talk about the results. Yes, and if you compare the results to what the prior description was of what they did, I mean, it seems to me that however, it's characterized a little bit later on page 11, the actual results when compared to what was said by the alleged fraudster, I'm having a hard time seeing how that wouldn't put somebody on inquiry notice, given given the numbers, not every notice, the numbers on page nine, the the note, the type of notice that Judge Burzon described. OK, so so that is not the legal standard in Arizona. If there's any question about that, I beg you to certify the question. But as to your honor's question about the facts, no, that would merely tell you that there's a misstatement. And so it's based the doer is based on sampling. Remember, so you could have different samples that produce different numbers. This the the error in the doer doesn't tell you that it's actionable. Here's Merck, quote, discovery of the facts constituting the violation, quote, does not automatically tell us whether the speaker deliberately lied or just made an innocent and therefore non-actionable error, end quote. So you're so in your view, your client could get this report and if and could deliberately choose to do nothing to investigate whether there was a scienter and then the statute would never run. Well, yes, judge. I mean, frankly, that's that's correct, because they had no reason to think that this was purposeful misrepresentation. That's that's a monumentally important difference in this case. And remember, this is on summary judgment. I thought there was a dispute in the briefs about whether one of your Mr. Moreland, I think, apparently said something in a deposition. But you say he did say about there being about whether there was that there was fraud and misrepresentation. Do you say he didn't say it? So, yeah, I mean, they say this. We point out at note three reply brief, page 13. I read that. That's why I just asked the question. And maybe this morning they'll treat us to the actual citation, but it's not there. You can take a look for yourself. I mean, maybe he said something later about what he now believes to be true. But those citations simply don't say what they say they do. So but I do want to dwell for a moment longer on the summary judgment standard. Here's the Arizona Supreme Court in Doe versus Rowe. Quote, the jury must determine at what point plaintiff's knowledge, understanding and acceptance of the in the aggregate provided sufficient facts to constitute a cause of action. End quote. It should be for the jury to decide. It is not impossible that a reasonable jury, at the very least, could say that when you saw that it was, quote unquote, possible that the numbers on which the doer were based were underestimated, that that would only tell you that there was an error. So. So, counsel, you know, I have to say I wasn't looking so much at somebody's footnote as opposed to Mr. Moreland's actual testimony. And I'm looking at SCR 361 dash 362. What I remember, we had Western Technology do whatever they did. And they came back saying that the property is not as stated in the doer. I couldn't sell it. I couldn't sell it saying there's a doer as I bought it. And this doer is misrepresented or it's fraudulent. I couldn't do it. That's irrelevant. That is a relevant as a legal matter, but be not what he's testifying to. What he's saying there is what he knows at the time. You know, Mr. Moreland is a layman. He's he's commenting on what he thinks is true at the time. And all he's really saying is a point. I mean, that is what a lay person would think was true at the time. Sufficiently. I'm sorry. At the time of the deposition. Your honor. I'm sorry. At the time of the deposition. Your honor. Not at the time. As just read, he seemed to be saying, I thought such and such, i.e. at the time. So first of all, he says, I thought it was erroneous or fraudulent. He's not using fraudulent. Well, no, he says misrepresent misrepresented. So so remember, here's here's how this error happened in the lower court. And I don't mean to cast aspersions. Good judges make mistakes. There were several tort claims, three tort claims that Moreland pressed. One of them was negligent misrepresentation. The summary judgment order does not distinguish between them. That's the genesis of the error and all of the questioning. And frankly, my friends on the other side repeat this in their brief where they talk about the, quote, unquote, tort claims. The only tort claim that we're appealing is fraud. Fraud is the only one that has scienter. And the district court simply didn't differentiate. And they also say, as I recall, that that you never actually raise the scienter question. Yeah, provably false. ER 632 is our opposition to their summary judgment where we make exactly this argument. In fact, it's in bold. So I beg your pardon. Citing Merck, not citing Merck. We cited Merck in the motion for reconsideration. But as you know, we need not cite a particular case to preserve the point. If you apply Merck faithfully to these facts, it is a very easy case on on the fraudulent misrepresentation. And if there's any question about what Arizona requires at the summary judgment stage against our client, please certify the question. I'll turn briefly now to the circle of question where I think there are three off ramps where our client or any private party remediating somebody else's pollution can obtain relief. It's I kind of think of this like an old fashioned law school flow chart. The first is whether it's a removal or a remedial action. If it's a removal action, no one disputes that we're eligible for reimbursement. If it's if it's a remedial action under CERCLA, then the question is whether there was sufficient state oversight. And then the question, if there wasn't sufficient state oversight, then the question is, did we substantially comply even at that point? If we prevail on any of those. So I would like to ask you to address the question of consistency with the NCP. And whether the nature of the not following the particular procedures disqualifies your client from recovering. Sure, the short answer is no, because although we did follow these procedures with substantial compliance, that's all that the statute requires. I'm not sure which procedure exactly the court has in mind, but the the state certification here and this is one of the statutes that we call the court's attention to its ARS 49-285B, the state, it's a cooperative federalism, CERCLA is a cooperative federalist statute where you cooperate with the state authorities and they have the ability to conclude that you've substantially complied. In Arizona, that's governed by 49-285B. Never mentioned in the answering brief, I might add. That statute concludes that when ADEQ approves, it is, quote, reasonable, necessary, cost effective, that the cleanup action has been reasonable, necessary, and cost effective. We obtained that with our settlement agreement with ADEQ. The only way in which the district court came to a different conclusion was by finding out that there is a second path to state approval in Arizona called the VRP. And the court concluded that the VRP was somehow more rigorous and that therefore you had to do that. Well, there's nothing in CERCLA that says that compliance has to be with the state's most rigorous protocol. And it happens also to be inaccurate that the VRP is more rigorous. So the district court erred both as a factual but more importantly as a legal matter. This court reviews substantial compliance de novo, by the way. And there are three circuits. We cite the cases in our briefs. NutraSuite in the Seventh Circuit, Niagara-Mohawk, I actually forget which circuit that is, and the City of Bangor. All three of those say that if you get state oversight and approval for your cleanup, that you have substantially complied with the National Contingency Plan. Well, the only case in this court that has held that agency involvement can satisfy the public participation requirement is Santa Clarita, is that right? Santa Clarita, I believe, spoke to the issue. I don't think this, candidly, Your Honor, I don't think this court has come down on one side or the other. Well, I thought it did. I thought Santa Clarita did, but the language was substantial and extensive government agency involvement. As I understand what happened here, perhaps because of the route they chose, I don't know, is there were the ADEQ, is that what it's called, looked at the plan at the beginning and looked at the certification at the end. Did they do anything else? Yes. ADEQ was incredibly involved in this case. I'll call the court's attention to pages 61 through 63 of the opening brief, as well as the chart at page 50. It's better if you just answer the question. I'm going to answer it. They developed the sampling strategy. They negotiated the administrative settlement, reviewed and commented on Synergy's work plan, spent months reviewing the work plan before approving compliance and reviewing the  Meaning they didn't do it for months, but they didn't spend months doing it. No, they did. Take a look at the timeline on page 51. You can see, I think it's, I want to say, on the order of three or four months that they spent reviewing the work after it was done. That is, by the way, on top of the 1993 Marsh consent decree and the 2004 fraudulent Dewar. So they have been involved in this cleanup site for decades. It is very substantial involvement. Here's Ms. Malone from ADEQ on the subject. Quote, in the administrative settlement, there's still oversight. There's still oversight. We review reports. We provide comments. That's 152, the following page. I don't want to, I don't want to lead you to believe there's no oversight. There's a lot of oversight in the administrative settlement. End quote. This is, this was an error by the district court based on the fact that there's a secondary path available. The only reason that we chose the settlement agreement as opposed to the VRP is that the administrative settlement gets you a release from liability. It's a better outcome. And we didn't have to redo anything. The only risk that the DEQ testified to was that there was a risk that you might have to redo something. Well, that wasn't the case. We were never ordered to redo something because it was a very professional cleanup. So in sort of long answer to Judge Graber's question, yes, we obtained an actual release from the state of Arizona saying that we had substantially complied with the NCP. And, you know, we trace that out at page 28 of the reply brief. But the relevant statutes are ARS. Can I ask a procedural question? The CERCLA claim was tried to the district judge in a rather lengthy trial. Is that right? Yes. So we're reviewing for any factual findings, which many of these it seems are. For what, clear error? No, the determination that we cite Bedford Affiliates, the Second Circuit case for this at page 427, the court reviews for substantial compliance by a private party, De Novo. Now, in this case, there are three legal errors. The classification as remedial rather than that can't be in the sense that we're reviewing findings by a district judge. And there's no particular reason the statute should be different than any other in how we review a district judge's factual findings. Why would we review De Novo when the district judge concluded, for example, that there was not substantial oversight? Why would we be reviewing that De Novo? Well, because substantial compliance is a legal question. Well, I understand that. It also sounds to me as if just harkening back to what you said a moment ago, that your argument in the alternative seems to be that there was clear error in view of what happened. That's certainly true, Your Honor. I don't want to abandon that. So thank you. But most of these rest on legal errors about what the standard is and including that standard of imposing a requirement that a person use the higher. Counselor, going back to Judge Berzon's question, you agree that if part of the determination by the district court as to substantial compliance is making factual determinations. Plaintiff says it was 10 gallons. Defendant says it was 50 gallons. I find it was 10. We're reviewing the underlying factual findings. The underlying questions. Yes, sure. That's right. With that, I'm going to save the remaining three. All right. Good morning, judges. My name is Jason Kovalt of the law firm Mapitenz of Aaron Gillespie. I'm here on behalf of the Goodyear Tire and Rubber Company and Goodyear Farms LLC with me as my partner, Andy Harnish, and a client representative is in the back of the room. May it please the court. At page 13 of the reply brief, plaintiff acknowledges for the first time the existence of a duty to investigate and admits that that inquiry turns on what the plaintiff reasonably knows. That's the sentence immediately above the footnote. Could you speak up a little bit? Yes. I'm going to speak further into the mic. Thank you. Yes. Thank you, Your Honor. So that's immediately above the footnote that you were talking about a moment ago. And there, the analysis becomes a review of all the facts upon which the district court granted partial summary judgment. And those were facts that were undisputed. And the vast majority of the facts that Goodyear cited to in its motion for partial summary judgment were unequivocally admitted. And among them was a dispositive and binding party admission by Moreland to the fact that the 2004 Dewar was misrepresented or it was fraudulent after Moreland received the 2015 Dewar. The Dewar, excuse me, the 2015 Western Technologies Report. The reason why that report is also important is what it says in sum and substance is you need to do more investigation to the plaintiff. It identifies that there are a number of problems. It was a cursory overview. It was not a full characterization of the property trying to figure out the precise 95 percent UCL calculation. It was an overview to see how difficult it would be to move the land from a legal commercial standard to a legal residential standard that was lower. And as a result of that. The aim of the report was actually nothing like what the plaintiff contends its case was, which was to return the land to 10 milligrams per kilogram. Many of the arguments that you have heard presume that there is something wrong with the land, but there was no showing that there was anything wrong with the land. I don't understand that. I mean, there was a showing that there was much higher concentrations than the the at least standard. There's as I understand it, there is a generic standard and then there are specialized standards if the agency. I'm happy to explain, Your Honor, the way that Arizona law provides is that there's three lawful levels. Arizona happens to have extremely high natural concentrations of arsenic. So background levels is one acceptable level just naturally occurring. Then there's an off the shelf SRL that's extremely conservative. That's the 10 milligrams per kilogram. That's so safe that the agency typically doesn't reevaluate. And then the third one is the site specific. And there you would get a risk assessor to come in and make a specific analysis of the site. And there could be a lawful level that's higher than the off the shelf. And that's this commercial level. And that's restricted by a doer. And that wasn't pursued here. So the short answer to your question, Your Honor, is you have to recalculate a 95 percent UCL that's higher than 10 to show that Goodyear did something wrong. The plaintiff was never able to do that calculation because it's math and statistics and methodology were not accepted by the district court because they were unreliable. And counsel, this seems to be counter to your argument that they should have understood at the time of the initial report saying that the amounts of arsenic and the other substance were vastly understated, that it mattered that they were vastly understated because the amount that existed was unacceptable for any development of the land. And now you seem to be saying it sort of doesn't matter because they didn't show anything. I don't those two things don't mesh in my mind. OK, so what the plaintiff does as a as a rough proxy for trying to show there's something wrong with the land and there's arsenic on it. The plaintiff will say there was something wrong with the land. I mean, the way it looks to me, your client made a mess and then lied about it. Didn't clean it up. So, you know, that I think that piece seems unassailable. OK, we disagree with that for this reason, Your Honor. First of all, you'd have to calculate a real number that the district court accepted showing that Goodyear's number was wrong. Hold on. Yes. You didn't answer Judge Graber's first question. Yes, please. I'm sorry. Would you please repeat it? I'm not meaning to. If, in fact, there is no clear requirement that was violated by the first DUER, then how are they supposed to be on? How could they? Why should they have known from the discrepancy that there was a problem? OK, unequivocally, Goodyear disputes that there was any fraud, but we have to assume what we're talking about, the statute of limitations problem now and how it interacts with the merits. No, I understand that. But what I'm saying is the very first step in the analysis is a necessity and the necessity could be with the risk analysis. The necessity could be with math showing that Goodyear's... Necessity is a circular concept. I don't understand why that affects the fraud claim. The way that you're describing it, it seems to me you're conflating the statutory issue with the court. I'm not trying to conflate the two. And I was trying to answer the different questions. I'm sorry. It was one question. OK, as I understand it. Yes. To prevail on the fraud claim. Yes. You. What do you need to demonstrate? And I'm sorry, on a limitations period. Yes. Yes. What what what is your burden on that? Our burden on that is to show that the plaintiff learned enough information that it triggered the duty to reasonably investigate. And now you're saying that that information, when you get to the merits, doesn't show what they think it shows. Right. So their position. So I'm having a I'm having, I think, the same problem as my colleagues. Yes. When I was looking at your briefs and looking at this 2015 report, it struck me that this was pretty clearly saying there's something really, really, really bad here. And it sounds to me that what your argument is, is, no, this isn't really showing anything really bad. I mean, in order to even find out whether it's bad, you'd need to do more. So if that's what it is, how can the statute start to run in 2015 if the report isn't even putting them on notice that that there was likely fraud? Because it may well be that these are immaterial. Or even likely a mistake or a problem with the property. Well, Mr. Moreland, on behalf of Moreland Properties LLC, admitted that he was thinking about fraud and misrepresentation. You're saying that he shouldn't have been thinking that because I'm not saying he could legitimately think about it because there were occasional very high numbers. But what the plaintiff would do is point to a high number, which is not a UCL where the plaintiff would say 12 out of 17 results were in exceedance. But that's not a 95 percent UCL. So the plaintiff could superficially see information that would lead the reasonable person to investigate further and file timely claims. But when you get to the end of the day and you look at the environmental science, the way the 95 percent UCL is calculated is not the way that the plaintiffs did it, it's the way that the district court affirmed. What in the 2015 report would you specifically point us to that would put the reasonable person on notice that there was something that Goodyear did that was fraudulent with Scienter? So the results show inconsistencies or seeming inconsistencies with the 2004 doer. The report, as many of these environmental reports do, starts with a recitation of the history of the parcel. It walks through who the owners were, including Goodyear. It talks about the doer. It talks about transfer of the property and then subsequent amendments to the doer and other changes to the property. Then there's all of the results that you were talking about, Judge Bennett. And then at the end, it says you need more testing. This is preliminary. That report was doing things like taking simple averages rather than a 95 percent UCL. All of what you said doesn't sound like it would put anybody on notice of potential fraud. But then when you look at all of the other undisputed facts upon which summary judgment was granted, there were a number of statements by agents of Moreland talking about the effect that that had on their mind. They lost a buyer. The buyer had been scared away. They had liability. Is the standard a subjective standard? I thought should have known is an objective standard. Should have known is, but it can become objective with the duty to inquire if the plaintiff never inquires. And then later on, we learn how long the inquiry would have been. To the extent Merck adds anything to. I'm sorry, I don't hear you. That's subjective, not subjective. It's not subjective. Whether or not it's objective.  So therefore, the question is not what they thought, but what a reasonable person would have thought in your standing. I'm quite surprised by all this. But you're you're you're been standing up here telling us that anybody who knew anything would know there wasn't really a problem here. Yes. If you go to an environmental engineer and you do a lot of tests, you will eventually and you use the correct environmental science like the district court listened to for days. Tell me something else. Why does your merits argument on CERCLA depend on any of this notion about that you've been standing up and telling us about the fact that there wasn't really a problem? What difference does that make? To the CERCLA, to your prevailing on CERCLA. I mean, I go ahead. Sure. So for CERCLA, they've identified four issues. Remedial versus removal. Right. Necessity, feasibility study, meaningful public participation. And they would have to run the gauntlet on all of them. You only have to prevail on some of them, right? Or one. Correct. Correct. Okay. So the argument seems to go to the necessity issue. It doesn't go to anything else. Right. Correct. But that's additive of the rest. Carson Harbor III resolved this same kind of case on summary judgment because of the failures of the lack of feasibility study and the lack of meaningful public participation. And both of those have nothing, don't depend in any way on whether there was, in fact, a major problem with a slant. It does. Because in the feasibility study, it evaluates reasonable alternatives across three different factors, cost, effectiveness in terms of health benefit, and engineering feasibility. So if there's a no action, it'll tell you your baseline risk. Then for every reasonable alternative after that, risk is going to be one of the components that's evaluated. There's competing interests. The defendant is entitled to a cost effective cleanup. So as cheaply as possible, but with good health outcomes. And then, of course, there needs to be an effectiveness evaluation. But in this instance, as I understand it, there was, you say there was no feasibility study and there's a lot of argument about, well, there was one a long time ago or whatever. But if there was no feasibility standard, although your opponents say that the only issue was a no action alternative, you say, well, no, there were other alternatives. That's correct. And isn't that issue divorced from the question of whether there was actually a major problem with this land or not? No, because if there's no problem with the land, you wouldn't need to do any of the alternatives to clean it up. But the practice they didn't do, your position is or should be they just didn't do it. What they would have found if they did do it isn't the question. I'm sorry, I don't understand. As to the feasibility studies. They just didn't do it. They didn't do it. And therefore, what they would have found if they did do it is really not our problem as to that criteria. Not at all. I don't think that the court can determine whether the project was cost effective without looking at the feasibility study. Well, was there an earlier feasibility study or not? There was not an earlier feasibility study as to arsenic, as to this piece of property, as it existed when the plaintiff did its remediation. So the plaintiff tries to say that. Well, what you're saying is there was a feasibility study, but you think it's not relevant. Is that what you're saying? No, I'm not. Because there wasn't an earlier circular project. Goodyear wasn't doing a circular project. There was no cost shifting. Marsh was under a consent decree at Winn-Salvis. So for a feasibility study to be done, does it have to be done pursuant to circular? Or could you just decide you want to do it and then have a feasibility study? So you seem to be hedging a lot on your answer. No, not at all. Oh, sorry. Where am I hedging, Your Honor? Well, it seemed to me that I said, was there an earlier feasibility study? And you said, well, not with respect to this piece of property and not with respect to that. So that sounds to me like there was one. I take your point. There wasn't one. They could have named something a feasibility study and did it. I don't think that they did. But the reason why I was talking about the differences in the land was to emphasize this point. When Goodyear had the property, when Marsh had the property, it was in the middle of nowhere, thousands of acres of farmland. Now it's completely surrounded by residential properties. The parcel is a different size. There's a different contaminant of concern that's being examined in the past, toxaphene and other things like DDE. And it's an arsenic cleanup now. So that difference is the reason why you can't take that older study because it doesn't tell you on a similar footing to today how this project is going to affect all the people that surround the project site. So, okay, that's fine. Okay, so just briefly to turn to the other elements of the NCP, lack of meaningful public participation. There was no attempt to put together a community plan. We're saying very broadly substantial compliance. What the plaintiff needed to do is say some kind of notice, some kind of meeting, and some kind of opportunity for the public to weigh in on the alternative that was ultimately selected. Again, as a matter of fact, the district court said none of that happened. So after... district court's findings, such as they didn't do X, Y, and Z for clear error, but that the question whether the absence of X, Y, and Z does or does not equal substantial compliance is either a mixed question or something, or a question of law that we reviewed. We agree. Okay. And Carson Harbor talks about NCP compliance being a question of fact. I believe that's Carson Harbor one.  But we agree that it's a mixed question when it comes to substantial compliance of NCP. And so the fact findings of the district court are considered, and then it's the legal conclusion of this court as to whether that was correct. But what about, for example, whether... what it was that ADEQ did and whether it was substantial and extensive? Yes. So the district court made a fact finding that the ADEQ involvement was very similar to the Carson Harbor 3 regulators' involvement, and found that it was not significant, was not substantial, and did not rise to the level where it could be a substitute for public participation. That sounds like a legal conclusion in a way. They did A, B, and C, but it wasn't good enough because of some other case. So it's illegal. So we get to look at whether what the state agency did equates to substantial compliance. What did the state agency do?  So what did the state agency do? So the state agency reviewed the projects. It approved them. Carson Harbor 3 has mere approval. The plaintiff's reports. I'm sorry. Please wait till Judge Berzon finishes. I actually have something to say, so you may listen. My apologies. Although now I don't remember what it is anymore. They reviewed it, meaning that Moreland, that they had a, that Goodyear gave them a plan and they looked at it? Moreland gave ADEQ a plan and they looked at it. But they didn't make the plan. They didn't make the plan, they didn't run the plan, they didn't do any testing, and they didn't verify any of plaintiff's math or statistics. They literally rubber stamped it and said they looked at it, but they didn't give it close scrutiny. They didn't have licensed. And when he said it took them months, does that just mean you gave it to them one day and four months later they gave you an answer or that for months they were doing something? I'm not aware of any evidence in the record that they were doing things for months. And so you're assuming that they didn't. Why is that a fair assumption? I'm not assuming that they didn't. Based on the testimony at trial that the district court cited, they said that they didn't do the analysis to check the plaintiff's work. And so because of that, the district court was examining the plaintiff's work and the plaintiff's environmental consultant's work for the first instance during the CERCLA trial. If the panel has no other questions, I will sit down. All right. Thank you, counsel. Thank you very much. And you have some time left. Thank you. A few quick points on rebuttal. The first is the discussion of statute of limitations. I couldn't think of a better illustration of why this is a jury question and not properly disposed on summary judgment. My friend on the other side noted that the WTI report in 2015 was, quote, not a full characterization and discussed seeming inconsistencies. That is exactly the sort of thing that you can't decide as a matter of law. Likewise, their alleged smoking gun of the testimony that Moreland gave later that involved misrepresentation or fraud. A jury could conclude that he was saying that it was misrepresentation or fraud. At that time, I didn't know that it was not just an innocent misrepresentation. That is not helpful to you because if he thought it was one or the other, he could easily. No, Your Honor, I disagree because all of these circumstances, that's why I read the Doe v. Roe case from Arizona. This is why juries make these determinations. Likewise, losing a buyer because the ground is polluted, and I can't believe they continue to fight this, because the ground is polluted is just as consistent with a negligent statement on the doer. Remember, you don't know that they've engaged in fraud at this point. You have a negligent statement on the doer that says it's 10, maybe because they just did a sloppy job. That is just as consistent with losing a buyer. Losing a buyer is just as consistent with negligence on Goodyear's part as it is with Sienter. All of these things militate in favor of sending it back to the district court. The insistence on an investigatory standard is inconsistent. Again, Merck 651. On the subject of CERCLA, I'd like to focus on the state involvement, which I think is one of the easiest ways for the court to dispose of this. Goodyear continues to say that the state did not develop the work plan, that it didn't make the plan, was my colleague's words. That's true. But the law doesn't require that they make the plan. This court and others say that it is review and oversight. That's what's involved. We have almost no law in this. What case are you relying on? As we established before, I thought Sandra Clarita was the only case that actually held that there is such a substitution. I'm fairly sure that the language in that case, although it'll take me too long to find it. It's language, though. It's not any particular. Okay. But then let me direct the court to the other cases. I mean, the three that I cited, NutraSuite, Niagara Mohawk, and Bangor, all of which are in the brief, those explain that it is review and oversight. I'll also add that during the time that ADEQ had the work plan, it was not just twiddling its thumbs. It actively asked questions. It was scrutinizing the work plan and asked questions of Moreland Properties, which we responded to, eventually got their approval, and most importantly, ARS 49285, Part B, obtained an approval from the state which underscored that it was necessary, cost effective, and substantially complied with the requirements of the state law. So we asked the court to reverse on the subject of, on the statute of limitations, send this case back for a trial on that, and clarify a few of these legal issues that we flagged in connection with CERCLA for the lower court to reassess. All right. Thank you. We thank counsel for their arguments, and the case just argued is submitted.
judges: GRABER, BERZON, BENNETT